628 P.2d 1052

In the Interest of Leticia CASTRO, a Child Under 18 Years.

Jose CASTRO, Appellant,

v.

The STATE of Idaho, DEPARTMENT OF HEALTH AND WELFARE, Respondent.

No. 13587.

Supreme Court of Idaho.

May 22, 1981.

Gregg E. Lovan of Rettig, Rosenberry & Lovan, Caldwell, for appellant.

David H. Leroy, Atty. Gen., David E. Wynkoop, Deputy Atty. Gen., Boise, for respondent.

McFADDEN, Justice.

Appellant Jose Castro seeks review of an order of the district court affirming an order of the magistrate division of that court which terminated his parental rights to his minor child, Leticia Castro, upon a finding that the child had been abused. I.C. § 16–2005(b). Appellant challenges the sufficiency of the evidence supporting the court's order of termination. After reviewing the record, the court is of the opinion that the order of termination must be affirmed.

The Idaho Department of Health and Welfare on March 2, 1979, filed a petition for termination of the parent-child relationship between Leticia Castro and her natural parents, Jose and Vicenta Castro. The petition alleged that the parents had abused the child or allowed her to be abused, and that termination of the parent-child relationship would be in the best interest of the child. I.C. § 16–2005(b).

Pursuant to I.C. § 16–2008, an investigation was undertaken by the Idaho Department of Health and Welfare, and a written report of that investigation relating to the parent-child relationship was filed with the magistrate court on March 2, 1979. The report, prepared by Mr. Mike Neher, senior social worker with the Department, discussed in detail the circumstances leading to the filing of the petition of termination.

The report discloses the following facts pertinent to this appeal. The Caldwell office of the Department of Health and Welfare had been in contact with the Castro

family since early November, 1978. The Department made contact with the Castros in response to a request by Mr. Walter Hall, Children Service worker, for the Los Angeles County Department of Public Social Services, Bureau of Social Services. In his request Mr. Hall stated that Leticia was in custody of the Los Angeles County Juvenile Court,[1] that the parents had left the Los Angeles area with Leticia and their two other children, and that he had reason to believe the Castro family was now residing in Caldwell. Mr. Hall indicated that there was a prior history of child abuse, and pursuant to the Interstate Compact for Placement of Children, his agency was requesting that the Idaho Department of Health and Welfare assume protective supervision of Leticia while the family resided in Idaho.

After determining that the Castro family was residing at the Caldwell Labor Camp, initial contact was made with the family by Health and Welfare social workers Mr. Charles Fletcher and Mrs. Judy Burns, after which the case was assigned to Mr. Neher for continued supervision. During these visits, the social workers were of the opinion that the parents seemed to be adequately providing for the physical and emotional care of Leticia and their two other children.

On February 18, 1979, Leticia was taken by her mother to Caldwell Memorial Hospital because the child was suffering from a grand mal seizure. Upon initial outpatient examination by Dr. Richard Gerber at Caldwell Memorial Hospital, Leticia was found to have multiple bruises and contusions on the left side of her back from her shoulder to her waist, severe bruises on the inside of her legs, and major bruises on her forehead. During his examination of Leticia, Dr. Gerber also observed that the child had sus-

tained bruising in the labia, vaginal and rectal areas, and had an unusually wide vaginal gapping for a four year old child. Due to the severity of Leticia's injuries and seizure activities, she was transferred from Caldwell Memorial Hospital to St. Alphonsus Hospital in Boise and from there to the pediatric ward of St. Luke's Hospital in Boise.

Leticia was discharged from St. Luke's Hospital on February 22, 1979. On that date the Department of Health and Welfare filed a petition for custody and a hearing in connection therewith under the Idaho Child Protective Act, I.C. § 16–1601, *et seq.*, and Leticia was placed in a foster home. Subsequently, the instant petition for termination was filed.

The petition came on for hearing in the Magistrate Division of the Third Judicial District on March 26, 1979. The record from the hearing discloses the following additional facts pertinent to this appeal.

The examining physician at Caldwell Memorial Hospital, Dr. Gerber, testified that during his initial outpatient examination of Leticia, he observed multiple bruises and contusions over her body. In his opinion, the injuries sustained were much more severe than could be expected from occasional episodes of the child falling down, and were likely produced from some "animate" source, i. e., human. The State also introduced into evidence photographs taken of Leticia while she was being treated at Caldwell Memorial Hospital. The photographs were introduced for the purpose of confirming Dr. Gerber's testimony, and depict graphically the extent and gravity of the injuries Leticia had sustained.

Mr. Castro's sister, Tomasa, testified as to several incidents in which the mother

---

1. Pursuant to a petition filed on March 31, 1977, Leticia was declared a dependent of the Los Angeles County Juvenile Court and placed in the care of a foster home. The petition alleged that the mother, Vicenta Castro, had slapped Leticia about the head and face for no apparent reason. The petition also alleged that Leticia's mother had on numerous occasions struck the child on or about the head after the child had undergone surgery in July 1976 for

the repair of a cystic formation along the left parietal of her skull. Following a court hearing on February 8, 1978, the child was placed in the home of her parents under the supervision of the Los Angeles County Department of Public Social Services. For several months prior to this time, Leticia's parents were involved in mental health therapy. Following her return to her parents, Leticia appeared well cared for.

struck Leticia in California. Tomasa stated that her brother was present when she had personally observed his wife hitting the child, and although he seemed concerned that the child was being abused, he did nothing to stop it. She also testified that although she had asked her brother to do something about his wife's abuse of Leticia, he undertook no affirmative action to prevent the abuse of the child.

Further testimony was offered at the hearing from Canyon County Deputy Sheriff Victor Rodriguez. Deputy Rodriguez interviewed Mr. Castro twice during his investigation of the circumstances surrounding the injuries sustained by Leticia. During the first interview Mr. Castro declined to offer any information concerning the cause of Leticia's injuries. However, Deputy Rodriguez testified that in the subsequent interview, after confronting Mr. Castro with the photographs taken at Caldwell Memorial Hospital, Mr. Castro admitted to him that the multiple bruises on Leticia's back were a result of the child being struck with a belt by her mother, and that the bruises on the child's legs were the result of his picking her up. Deputy Rodriguez further testified that Mr. Castro could only speculate as to the origin of the other injuries sustained by Leticia.

Finally, Mrs. Betty Taylor and Mr. Pete Reyes also testified at the hearing. Upon being discharged from St. Luke's Hospital, Leticia was initially placed in the foster care of Mrs. Taylor. Mrs. Taylor testified that Leticia was very aggressive and even perhaps abusive toward younger children. She further testified that at night Leticia was restless and would cry out in her sleep "no mommy, no mommy." Leticia was subsequently placed in the foster care of Mr. and Mrs. Pete Reyes. Mr. Reyes testified that, as in Mrs. Taylor's home, Leticia would cry out while sleeping "no mommy, no more mommy, don't hit me no more mommy." Furthermore, Mr. Reyes testified that the child would hide and cower in the bathroom, and upon being found, would ask if the Reyes were going to hit her. Mr.

Reyes also noted that Leticia would undress the dolls she played with and then hit them repeatedly.

After the conclusion of the hearing, on March 26, 1979, the presiding magistrate made a number of factual findings. Among others, the magistrate found:

"5. That the natural mother, Vicenta Castro, slapped the head of the minor child in the State of California approximately two years prior to the date of this hearing. That the said child had surgery on the head area approximately five months prior to when the mother struck the child. That as a result of said abuse, the child was placed in a foster home in the State of California for a period of approximately one year.

6. That on or about the 18th day of February, 1979, the parents, Jose and Vicenta Castro caused and or allowed to be caused, serious physical injury to the body of Leticia Castro including injury to the left flank, lower back, inside of legs, rectal area and labia of said Leticia Castro. That said child was hospitalized as a result of said injury.

7. That Leticia Castro has exhibited to foster parents which shows her past mistreatment including undressing and spanking dolls and crying in the middle of the night 'mommy don't hit me.'

8. That the father, Jose Castro, either abused, or was in a position that he was certainly aware of the abuse and has done nothing to prevent said abuse."

Based upon these findings, the magistrate concluded as a matter of law that Leticia had been seriously abused by her parents, and that the parent-child relationship existing between them should be terminated.

The decree was appealed to the district court by both parents. Acting as an appellate court, the district court affirmed the magistrate's decision and remanded the case. The instant appeal from the decision is brought only by Leticia's natural father, Jose Castro.[2] The thrust of Mr. Castro's

---

**2.** Although both parents appealed the magistrate's decision to the district court, for some reason undisclosed from the record, Leticia's natural mother, Vicenta Castro, chose not to continue the appeal to this court.

appeal is that the record does not support a finding that he knew of the abuse and did nothing to prevent it.

I.C. § 16–2001, *et seq.*, govern the termination of the parent-child relationship. The purpose of the act is set forth in I.C. § 16–2001:

"16–2001. Purpose.—The purpose of this act is to provide for voluntary and involuntary severance of the parent and child relationship and for substitution of parental care and supervision by judicial process, thereby safeguarding the rights and interests of all parties concerned and promoting their welfare and that of the state of Idaho. Implicit in this act is the philosophy that wherever possible family life should be strengthened and preserved and that the issue of severing the parent and child relationship is of such vital importance as to require a judicial determination in place of attempts at severance by contractual arrangements, express or implied, for the surrender and relinquishment of children."

The act provides six conditions under which the parent-child relationship may be terminated. I.C. § 16–2005(a)–(f). In this case the magistrate ordered termination of the parent-child relationship under subsection (b) of I.C. § 16–2005, which provides:

"16–2005. Conditions under which termination may be granted.—The court may grant an order terminating the relationship where it finds one or more of the following conditions exist [exists]:

. . . .

b. The parent has neglected or abused the child. Neglect as used herein shall mean a situation in which the child lacks parental care necessary for his health, morals and well-being."

■ In proceedings involving the termination of a parent-child relationship, as in other matters, the findings of the trier of fact will not be disturbed on appeal where there is competent and substantial evidence to support them. *In re Matthews*, 97 Idaho 99, 540 P.2d 284 (1975); *Yearsley v. Years-*ley, 94 Idaho 667, 496 P.2d 666 (1972); *State ex rel. Child v. Clouse*, 93 Idaho 893, 477 P.2d 834 (1970). In reviewing such findings, this court will indulge all reasonable inferences in support of the trial court's judgment. *Id.*

Applying these standards to the instant case, it cannot be said, as a matter of law, that the judgment of the trial court is lacking in evidentiary support.

The gravity of the injuries to Leticia depicted in the photographs reflect extensive, long-term mistreatment of the child. The magnitude of the abuse and its debilitating effects are further reflected in Leticia's subsequent conduct in the foster homes she was placed in, i. e., cowering from adults for fear of being hit, aggressive and perhaps abusive behavior toward younger children, and while asleep, crying out in fear of being hit by her mother. The very condition of Leticia speaks for itself, and gives rise to an inference that the appellant must have known of the abuse the child was suffering, inasmuch as he, his wife and Leticia were all living together during the period of time the abuse occurred. *See In re S.*, 46 Misc.2d 161, 259 N.Y.S.2d 164, 165 (Fam.Ct.1965); *Higgins v. Dallas County Child Welfare Unit*, 544 S.W.2d 745, 750 (Tex.Civ.App.1976). *See also* Fraser, "A Pragmatic Alternative to Current Legislative Approaches to Child Abuse," 12 Amer.Crim.L.Rev. 103, 117 (1974); Brown, "Medical and Legal Aspects of the Battered Child Syndrome," 50 Chi-Kent L.Rev. 45, 70 (1973).

Moreover, the record indicates that the appellant in fact was aware that his wife was physically abusing their daughter. The testimony of appellant's sister Tomasa reveals that he was aware of his wife's serious mistreatment of the child while the family resided in California, yet he took no decisive or effective action to assure the child's future protection. The appellant was also aware of at least some of the physical abuse of Leticia that occurred in Idaho as well. Deputy Rodriguez testified that the appellant specifically stated that

his wife had struck their daughter on the back, resulting in the multiple bruises on the left side of the child's back from her shoulder to her waist. The record also indicates that it was apparently with hesitation and reluctance that the appellant admitted his wife's misconduct at all to Deputy Rodriguez.

■ In conclusion, regardless of whether the appellant caused or aided in the physical abuse of Leticia, the record discloses that at the very least he acquiesced in the physical abuse of his daughter and failed to take any preventive measures to assure the child's future protection. The weight of authority is to the effect that one spouse's acquiescence in or failure to prevent the other spouse's physical abuse of their child(ren) is competent and substantial evidence supporting a decree terminating parental rights to the child(ren). *See, In re Corrigan,* 134 Cal.App.2d 751, 286 P.2d 32 (1955); *In re Halamuda,* 85 Cal.App.2d 219, 192 P.2d 781 (1948); *Dornburg v. McKellar,* 204 Ga. 189, 48 S.E.2d 820 (1948); *In re U. J. A.,* 407 S.W.2d 573 (Mo.App.1966); *In re Z.,* 190 N.W.2d 27 (N.D.1971); *In re Carpenter,* 21 Wash.App. 814, 587 P.2d 588 (1978). Accordingly, we hold that appellant's failure to protect his daughter from the constant physical abuse inflicted by his wife and his apparent acquiescence in such abuse is competent and substantial evidence supporting the decree terminating his parental rights to Leticia.

Order affirmed.

BAKES, C. J., and BISTLINE, DONALDSON and SHEPARD, JJ., concur.