# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 45207

| | |
|---|---|
| Re: In the Matter of the Termination of the Parent-Child Relationship of JOHN DOE I (2017-21), a Child, and JANE DOE and JOHN DOE. <br> ---------------------------------------------------- <br> IDAHO DEPARTMENT OF HEALTH AND WELFARE, <br><br>      Petitioner-Respondent, <br><br> v. <br><br> JOHN DOE I, a Child (2017-21), <br><br>      Appellant. | Boise, October 2017 Term <br><br> 2017 Opinion No. 133 <br><br> Filed: December 22, 2017 <br><br> Karel A. Lehrman, Clerk |

Appeal from the District Court of the Third Judicial District of the State of Idaho, Canyon County. Hon. Frank P. Kotyk, Magistrate Judge.

The magistrate court's judgments terminating parental rights of mother and father are <u>reversed</u>.

Krista L. Howard, Interim Canyon County Public Defender, Caldwell, for appellant.

Hon. Lawrence G. Wasden, Idaho Attorney General, Boise, for respondent Idaho Department of Health & Welfare.

Danielle Scarlett, Nampa, for respondent Guardian ad Litem.

_____

BRODY, Justice.

This cases involves the statutory termination of parental rights by two adoptive parents after John Doe I ("Child") was alleged to have sexually assaulted a sibling. The magistrate court entered judgments (one for each parent) terminating the Does' parental rights on three grounds: inability to discharge parental responsibilities, best interest of the Does and Child, and voluntary consent. Child now appeals. We reverse the judgments terminating the parental rights of the Does.

1

# I.     FACTUAL AND PROCEDURAL BACKGROUND

John and Jane Doe adopted Child in June 2016. The Does' adoption came after a previous out-of-state adoption of Child was ended through legal termination of parental rights (the Department calls this a "disrupted adoption"). In September 2016, the Idaho Department of Health and Welfare ("the Department") received a report from Jane Doe that Child had sexually assaulted his younger sister (aged nine), another adoptive child of the Does. Child was twelve years old at the time of the incident. Thereafter, the Does worked with the Department and juvenile corrections personnel to determine the best course of action with regard to Child.

In October 2016, Child's juvenile corrections proceeding was expanded to a child protective proceeding, and he was placed in shelter care with the Department. The expansion order specifies that "[t]he parents indicate [Child] will never be able to return to their home due to the safety of the other children." In addition to their adoptive children, the Does also have two biological children—aged eight and ten—who lived in their home at the time of the incident. Child was subsequently taken to a residential care facility in Utah ("the Utah facility") to receive treatment, including mental health services. The decision to place Child with the Utah facility was made jointly by the Does and the Department. The treatment program was not permanent placement, but Child's completion of the program was expected to take up to a year.

Shortly after Child was taken to the Utah facility, the magistrate court decreed that Child was to be placed under the protective custody of the Department because it would be contrary to Child's welfare to remain in the Does' home. The magistrate court then held a hearing on the case plan submitted by the Department and approved the plan without any objections from the parties. The case plan is not included in the record, but at the hearing the magistrate court noted that it featured a reunification plan and an alternative placement plan; at that time, Child's only role was to complete his treatment at the Utah facility. Child was represented at the hearing by counsel and appeared by telephone.

In March 2017, the magistrate court conducted a status review hearing, at which time counsel for the Does requested an opportunity for her clients to provide sworn testimony regarding their voluntary termination of the parent-child relationship. The magistrate court denied the request and described it as procedurally improper because the State and the Department had not yet moved to change the permanency goal of the case plan or filed a petition for termination of parental rights. During the hearing, counsel for Child made a preemptive

objection to termination on the grounds that (1) terminating the parent-child relationship would place Child in foster care for the remainder of his minority and (2) the Does had an obligation to support their child. Counsel for the Does stated that her clients had exhausted every option as far as relative and kinship placement of Child, and that termination was the only possible resolution given that Child could not return to their care and custody. Counsel for the guardian ad litem acknowledged that her client was supportive of termination. Child appeared telephonically.

In April 2017, the Department filed a Verified Petition for Termination of the Parent-Child Relationship on the grounds of John and Jane Doe being unable to discharge parental responsibilities. The Petition also stated that termination was in the best interest of Child. A petition for adoption was not filed in conjunction with the Petition. Attached to the Petition is the Department's Report of Investigation for Termination of Parental Rights. On the same day, the magistrate court held a six-month review hearing, during which John and Jane Doe each executed a Voluntary Termination of Parental Rights. The Does provided sworn testimony regarding their intent to terminate their parental rights and were each subject to cross-examination. Following the Does' testimony, counsel for Child objected to (1) relieving the Department from making reasonable efforts at reunification and (2) changing Child's permanency goal to termination of parental rights and adoption. The magistrate court approved both matters over counsel's objections. Child filed an objection to the Department's Petition.

On June 29, 2017, the magistrate court conducted a hearing on the termination of parental rights. Once more, Child appeared by telephone from the Utah facility. The Department social worker who drafted the Department Report was subject to examination. The magistrate court provided the parties with an opportunity to present additional evidence and witnesses, but both sides rested their cases. The magistrate court ruled from the bench that the Does' parental rights were to be terminated based on a finding by clear and convincing evidence that (1) the Does provided voluntary consent; (2) the Does were unable to discharge parental responsibilities and such inability would continue for a prolonged indeterminate period and would be injurious to the health, morals, or well-being of Child; and (3) termination was in the best interest of the Does and Child. The magistrate court subsequently issued written Findings of Fact and Conclusions of Law. The magistrate court also entered judgments terminating the parent-child relationships between Child and John and Jane Doe, and vesting legal custody and guardianship with the Department. Child now appeals.

3

## II.    STANDARD OF REVIEW

The State must prove the grounds for terminating a parent-child relationship by clear and convincing evidence. Idaho Code § 16–2009; *State v. Doe*, 143 Idaho 383, 386, 146 P.3d 649, 652 (2006). "In an action to terminate parental rights, where the trial court has explicitly determined the case by application of the clear and convincing evidentiary standard, this Court must determine if the decision was supported by substantial and competent evidence." *In re Doe*, 146 Idaho 759, 761, 203 P.3d 689, 691 (2009). "Substantial competent evidence is 'such evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting *In re Doe*, 143 Idaho 343, 345–46, 144 P.3d 597, 599–600 (2006)). "'[T]his Court will indulge all reasonable inferences in support of the trial court's judgment' when reviewing an order that parental rights be terminated." *Matter of Aragon*, 120 Idaho 606, 608, 818 P.2d 310, 312 (1991) (quoting *In Interest of Castro*, 102 Idaho 218, 221, 628 P.2d 1052, 1055 (1981)).

## III.    ANALYSIS

Child's appeal centers on the issue of whether the magistrate court's decision to terminate parental rights violated his due process rights. Child first argues that his procedural due process rights were violated based on the manner in which the magistrate court conducted the termination proceeding. He also contends that his substantive due process rights were violated, both generally and absent a showing that reasonable efforts were made to reunite him with the Does. These arguments are addressed in turn.

### A. The magistrate court did not violate Child's procedural due process rights.

Child contends that his due process rights were violated because the magistrate court did not hold a trial prior to terminating the Does' parental rights. Child argues that he was entitled to a "sufficient, thorough hearing with full opportunity to both hear the evidence and arguments against one's position and to be heard as to one's own evidence." The Department contends that the magistrate court met all of the statutory requirements necessary to protect Child's rights. Particularly, the Department argues, a termination hearing was held pursuant to Idaho Code section 16-2009 and the magistrate court's findings were thereafter articulated in writing pursuant to section 16-2010(1).

When terminating parental rights, the parties' respective liberty interests are statutorily protected by the requirements of a hearing at which the grounds for termination must be established by clear and convincing evidence. I.C. § 16–2009. Section 16-2009 provides:

4

Cases under this act shall be heard by the court without a jury. The hearing may be conducted in an informal manner and may be adjourned from time to time. Stenographic notes or mechanical recording of the hearing shall be required. The general public shall be excluded and only such persons admitted whose presence is requested by any person entitled to notice under the provisions of section 16-2007, Idaho Code, or as the judge shall find to have a direct interest in the case or in the work of the court; provided that persons so admitted shall not disclose any information secured at the hearing which would identify an individual child or parent. The court may require the presence of witnesses deemed necessary to the disposition of the petition, except that a parent who has executed a waiver pursuant to section 16-2007, Idaho Code, shall not be required to appear at the hearing.

The parent or guardian ad litem shall be notified as soon as practicable after the filing of a petition and prior to the start of a hearing of his right to have counsel, and if counsel is requested and the parent or guardian is financially unable to employ counsel, counsel shall be provided. The prosecuting attorneys of the several counties shall represent the department at all stages of the hearing.

The court's finding with respect to grounds for termination shall be based upon clear and convincing evidence under rules applicable to the trial of civil causes, provided that relevant and material information of any nature, including that contained in reports, studies or examinations, may be admitted and relied upon to the extent of its probative value. When information contained in a report, study or examination is admitted in evidence, the person making such report, study or examination shall be subject to both direct and cross-examination.

Here, the record establishes that the magistrate court conducted a hearing in compliance with section 16-2009. The parties convened across seven closed-door sessions prior to termination, including a six-month review hearing and a termination of parental rights hearing. The parties of record, including the Does and the guardian ad litem, were represented by counsel throughout the proceedings. Child appeared telephonically for nearly all of the hearings, including the termination of parental rights hearing. John and Jane Does' voluntary consent was executed following sworn testimony and subject to cross-examination. Similarly, the Department social worker who drafted the Department Report was subject to examination. Child characterizes the termination hearing as "perfunctory" and "truncated." Yet, when the magistrate court provided an opportunity to present evidence and argument, Child's attorney deferred to the record and rested his case. Contrary to Child's contentions, the magistrate court met the procedural due process requirements for a hearing under section 16-2009.

While Child does not raise other procedural errors in his brief, it bears mentioning that the Petition was filed by the Department pursuant to sections 16-2004 and 16-2006, proper

5

notice was provided to the necessary parties pursuant to section 16-2007, and the magistrate court issued written findings in compliance with section 16-2010. Moreover, during a status hearing in March 2017, the magistrate court denied a request to hear the Does' testimony as to their voluntary consent because—as a matter of proper procedure—the parties had not yet filed a petition for termination or moved to change the permanency goal of the case plan. The substance of the magistrate court's findings is discussed in full below; however, the record shows that care was taken to ensure the necessary procedural safeguards were followed. In review of the record, we hold that Child's procedural due process rights were not violated.

## B. The record does not contain substantial and competent evidence to support the magistrate court's determination that termination of parental rights is in the best interest of Child.

The crux of Child's appeal rests with his argument that the magistrate court erred in finding substantive grounds on which termination of the Does' parental rights was warranted. Child asserts that the magistrate court permitted the Does to effectively reverse their adoption of him in a manner that has no legal basis. The Department argues in response that Child is merely attempting to have the evidence reweighed and that the magistrate court's findings comport with the statutory grounds for termination. We agree with Child that there is not substantial and competent evidence to support the magistrate court's determination that termination of parental rights is in Child's best interest.

This case arises out of Title 16, Chapter 20 of the Idaho Code, which is designed, in part, to provide a method for the courts to order termination of a parent-child relationship when warranted. I.C. § 16–2001(1). Yet, "[i]mplicit in this chapter is the philosophy that wherever possible family life should be strengthened and preserved and that the issue of severing the parent and child relationship is of . . . vital importance." I.C. § 16–2001(2). This reflects the fundamental liberty interest in maintaining the parent-child relationship that is embodied in the Fourteenth Amendment of the U.S. Constitution. *In re Doe*, 146 Idaho 759, 761, 203 P.3d 689, 691 (2009) (citing *Quilloin v. Walcott*, 434 U.S. 246, 98 S. Ct. 549, 54 L. Ed. 2d 511 (1978)).

Termination of parental rights may only be ordered if the court finds by clear and convincing evidence that at least one of the nonexclusive conditions under section 16-2005 is met. I.C. §§ 16-2005, 16-2009. The magistrate court found termination of the Does' parental rights was justified under sections 16-2005(1)(d), (3), and (4), which read as follows:

(1) The court may grant an order terminating the relationship where it finds that termination of parental rights is in the ***best interests of the child*** and that one (1) or more of the following conditions exist:

. . . .

(d) The parent is unable to discharge parental responsibilities and such inability will continue for a prolonged indeterminate period and will be injurious to the health, morals or well-being of the child.

. . . .

(3) The court may grant an order terminating the relationship if termination is found to be in the ***best interest of the parent and child***.

(4) The court may grant an order terminating the relationship where a consent to termination in the manner and form prescribed by this chapter has been filed by the parent(s) of the child in conjunction with a petition for adoption initiated by the person or persons proposing to adopt the child, or where the consent to termination has been filed by a licensed adoption agency, no subsequent hearing on the merits of the petition shall be held. . . .

I.C. § 16-2005 (emphasis added). The issue presented is whether there is substantial and competent evidence in the record to support the magistrate court's findings as to these conditions. We will affirm if substantial and competent evidence supports at least one of the bases for termination.

The magistrate court found that termination was warranted under two provisions that are typically used to involuntarily terminate parental rights: section 16-2005(1)(d) and section 16-2005(3). *In re Termination of Parental Rights of Doe (2013-17)*, 155 Idaho 896, 901–02, 318 P.3d 886, 891–92 (2014); *Dep't of Health & Welfare v. Doe I*, 147 Idaho 314, 319, 208 P.3d 296, 301 (2009). Under both of these provisions, there must be clear and convincing evidence that termination of parental rights is in the best interest of the child. This is necessarily determined on a case-by-case basis. *In re Doe*, 159 Idaho 192, 198, 358 P.3d 77, 83 (2015). Among the factors that are often considered under this analysis include the parent's ability to change his or her conduct to assume parental responsibilities, whether there is a good relationship between the child and parent, whether the child has improved while in the parent's care, whether the child's needs are being met, and the parent's ability to provide stability and certainty. *E.g.*, *Idaho Dep't of Health & Welfare v. Doe (2016-37)*, 161 Idaho 647, 652, 389 P.3d 192, 197 (Ct. App. 2016).

Typically courts have reviewed the best interest of a child where involuntary termination of parental rights is being considered because the parent has shown a prolific incapability of providing for his or her children. *See, e.g.*, *Matter of Doe (2017-6)*, 162 Idaho 280, 283–84, 396

P.3d 1162, 1165–66 (2017) (finding father was a serial child molester that had sexually abused most of his seven children over sixteen years); *Idaho Dep't of Health & Welfare v. Doe (2016-32)*, 161 Idaho 754, 761–62, 390 P.3d 1281, 1288–89 (2017) (finding mother lacked stable housing or employment, did not improve situation after children were removed from her custody, and purchased drugs instead of paying child support). A positive response to foster care is another common factor in finding that the child's best interest is in termination. *See, e.g.*, *Idaho Dep't of Health & Welfare v. Doe (2016-14)*, 161 Idaho 596, 604, 389 P.3d 141, 149 (2016) (finding child had a parental bond with foster parent and had stability in pre-adoptive placement).

Here, the magistrate court found it was in Child's best interest to terminate the Does' parental rights. The magistrate court did not provide any details specific to this finding when ruling from the bench or in the written Findings of Fact and Conclusions of Law. On appeal, Child broadly argues that the finding as to his best interest was in error because it did not consider his loss. He specifically contends that appropriate weight was not given to the impending removal of benefits that were provided to him by the Does such as emotional support from and relationships with his parents and siblings; a safe home and adequate food, clothing, and medical care; and care and services that address his mental and physical health needs. The Department does not directly respond to Child's argument as to his best interest, although it does generally assert that Child is improperly asking this Court to reweigh the evidence.

The incident underlying Child's juvenile corrections proceeding places an obvious strain on the relationship between Child and the Does. Nonetheless, the record also shows that the Does maintain a stable and certain environment, provide protective care and financial support, and satisfy other basic human needs of their children. Significantly, Jane Doe completed schooling to be a social worker, while John Doe is a college professor. The Department Report outlines positive parental profiles for the Does, stating further that even after Child was removed from the home and began treatment at the Utah facility, the Does remained in communication with him and, at least temporarily, expressed desire for him to receive their love and care. The Report notes that both Jane and John Doe reported that they wanted to be a part of Child's life, and that they did not want to terminate their rights due to the love and care they held for him. Collectively, these factors strongly indicate that the Does are able to provide a beneficial

environment that is responsive to Child's needs. Such ability carries additional importance given Child's current condition and treatment.

Conversely, the record does not contain substantial or competent evidence that it would be in Child's best interest to sever the parent-child relationship. The Department made the case that termination was in Child's best interest because it would, in turn, activate the Department's ability to find a new placement option. The Department Report spells this position out in the following recommendation:

> The Department does not agree on making this child a legal orphan, however due to the circumstances of the case and the fact [Child] will never be able to return to his adoptive parents, we support termination.

> Termination is in the best interest of [Child] right now so the Department can begin to look for another family setting for him and let them get to know him and help him through the process of his treatment. Waiting until 15 months would just prolong permanency for [Child].

At the termination hearing, the Department social worker explained that the recommendation was premised on the idea that Child was unable to return to the Does' home. She acknowledged that a permanent placement option had not yet been found, and confirmed that Child had not been found guilty of any violation of Idaho law at that time.

The magistrate court's finding as to Child's best interest seems to be based entirely on the idea that Child could not return to the Does' home. This conclusion is not supported by the record. Namely, the record does not include a court order or decree from the juvenile corrections proceeding that would foreclose his reentry into the home. The record is also absent of any sort of expert report, opinion, or testimony providing details as to Child's medical, physical, or emotional condition that would support this idea. Moreover, the record is devoid of any documentation showing that alternative placement options were pursued other than conclusory statements that an option is not available. When asked for her opinion on Child's best interest, Jane Doe expressed her belief that Child was exactly where he needed to be while receiving treatment at the Utah facility. She later acknowledged that the treatment program is not permanent placement, and that once completed Child will essentially have no place to live.

Without countervailing evidence, the record intimates that the Does provide the exact type of situation that would be in the best interest of a child who is undergoing treatment designed to help him learn to productively behave and cope. The Department Report notes that Child has difficulties in relationships with authority and peers. Yet, the Report also states that,

during his time at the Utah facility, he is slowly changing his negative behaviors and learning how to establish friendships and work with adults. Child was adopted by the Does after a disrupted adoption. This is not a situation where Child is developing a positive relationship with a foster care parent, nor does he even have a ready placement option. Rather, the Department acknowledges the process to locate a permanent placement option must start anew. These facts support Child's argument that once again subjecting him to an uncertain future as a result of parental abandonment—at a time when he is receiving treatment designed to enable him to feel safe and secure—would not be in his best interest.

The best interest standard is adjudged on a case-by-case basis after review of all of the circumstances at hand. Here, we find that the record fails to show by substantial and competent evidence that it is in the best interest of Child to have the Does' parental rights terminated. As such, the magistrate court's findings that termination was warranted under section 16-2005(1)(d) and section 16-2005(3) were in error.

While the above holding is dispositive as to the application of section 16-2005(1)(d), we will also address the statutory condition under that provision insofar as doing so lends future guidance to our courts and the Department. Specifically regarding section 16-2005(1)(d), Child contends that the magistrate court erred in finding that the Does are "unable to discharge parental responsibilities and such inability will continue for a prolonged indeterminate period and will be injurious to the health, morals or well-being of the child." In support of that contention, Child emphasizes that John and Jane Doe are protective of their children, adding that

> [Jane and John Doe] are fit parents. [Jane Doe] is a trained social worker. [John Doe] is an academic professional. It would be hard to find more qualified individuals capable of caring for this child. While the parents may have concerns regarding re-offense, these parents are capable and qualified to provide their children with the skills necessary to become productive citizens.

Child argues that instead of being *unable*, the Does are merely *unwilling* to discharge parental responsibilities due to the circumstances surrounding his juvenile corrections proceeding. In response, the Department asserts that the magistrate court's finding was based on evidence showing that the Does cannot bring Child back into their home. According to the Department, Child is asking this Court to reweigh the evidence with disregard for the role of the magistrate court.

Before unpacking the case law and record as to the Does' fitness, it bears reviewing what the record shows with regard to Child. While inquiry under section 16-2005(1)(d) centers on the

ability of the Does to discharge parental responsibilities, their capacity to do so may be impaired based on the specific situation they face.

Child first entered the Does' home in August 2015. The Does' adoption of Child was finalized in June 2016. The sexual assault incident was reported in September 2016. On October 14, 2016, Child was placed in shelter care with the Department. On October 18, 2016, a joint decision was made by the Department and the Does to place Child with the Utah facility for treatment purposes. Then, on November 15, 2016, the magistrate court decreed that Child was to be placed under the protective custody of the Department. At the time of the termination hearing and when the termination orders were entered, Child was still residing at the Utah facility and his juvenile corrections proceeding remained pending.

The Department Report filed with the Petition for Termination includes an assessment of Child's continuing treatment, which states:

> [Child] is a twelve year old child. He is a seventh grade[r]. [Jane Doe] informed that she was informed by the adoption agency that [Child] had been diagnosed with [Oppositional Defiant Disorder, Reactive Attachment Disorder, and Attention Deficit Hyperactivity Disorder]. On 10/18/16 [Child] has been place[d] at [the Utah facility]. [Child] receives initial and ongoing medical and dental care, management of prescription and [over-the-counter] drugs, nutritional meals and developmental assessments. . . .
>
> [Child] receives mental health services based on needs and authorization. He receives both individual and group therapy every week. Therapist will send progress monthly and Treatment Plan reviews quarterly. [Child] presents to [sic] struggles to show respect towards adults and peer[s]. He is rude to peers and adults and struggles to accept no answers. He is slowly changing these behaviors and learning how to establish friendships. He is trying to impress certain adults and get on their good side. He has befriended a peer who struggles as well and they feed negatively off of each other.

The Report also assesses Child to be vulnerable and out-of-control, and therefore unsafe and requiring a safety plan. The Report notes that an out-of-home safety plan is necessary because the Does' home is not calm enough or equipped for the task, and an in-home safety plan is not desired. The Report further specifies that Child is prescribed psychotropic medication. Following the sexual assault incident, the Doe children informed Jane Doe that Child had demonstrated other threatening behavior prior to the incident. Transcripts from the various hearings indicate that Child has displayed some negative and regressive behavioral trends—including a possible petty theft—while at the Utah facility. The record does not provide extensive details or first-hand reporting on this behavior.

11

Akin to case law discussed above, this Court's precedent reveals that section 16-2005(1)(d) has typically been applied to involuntarily terminate parental rights when the parent has shown a prolific incapability of providing for his or her children. For instance, we affirmed termination where evidence showed a mother's repeated inability to discharge parental responsibilities due to "her commission of crimes, her instability in housing, her probation violations, her failure to obtain employment, her failure to refrain from inappropriate associations, her failure to comply with any of the case plan tasks, her repeated failure to follow through with drug treatment, and her repeated incarcerations." *Idaho Dep't of Health & Welfare v. Doe (2016-11)*, 160 Idaho 824, 832, 379 P.3d 1094, 1102 (2016).

Similarly, the condition was met in a case where the parents suffered from complex developmental disabilities that caused low intellectual abilities and a lack of knowledge and skills to survive, to conduct their lives independently, and to care for their child in a safe manner. *Dep't of Health & Welfare v. Doe*, 149 Idaho 207, 207–08, 233 P.3d 138, 138–39 (2010) (explaining that the mother was diagnosed with epilepsy, depressive disorder, and mild mental retardation, and the father was diagnosed with oppositional-defiance disorder, schizotypal personality disorder, and organic brain syndrome). The condition also was met where, over the course of several years, a father refused to remove or otherwise protect his children from physical and emotional abuse and an abusive environment. *In re Doe Children*, 159 Idaho 664, 668, 365 P.3d 420, 424 (Ct. App. 2015). See also *In re Doe*, 159 Idaho 192, 197, 358 P.3d 77, 82 (2015), where parental rights were terminated under section 16-2005(1)(d) because a father would be incarcerated throughout the child's minority due to a murder conviction.

The Court has explained that section 16-2005(1)(d) closely resembles the definition of "neglect" under the Child Protective Act, Idaho Code section 16-1602(31)(b). *Idaho Dep't of Health & Welfare v. Doe (2016-32)*, 161 Idaho 754, 761 n.4, 390 P.3d 1281, 1288 n.4 (2017); *see* I.C. § 1602(31)(b) ("'Neglected' means a child . . . [w]hose parents, guardian or other custodian are unable to discharge their responsibilities to and for the child and, as a result of such inability, the child lacks the parental care necessary for his health, safety or well-being[.]"). In light of the parallel language, we held that both statutory provisions applied where a mother had a significant history of hard drug use and possession; allowed her infants to live in filthy and hazardous conditions, and with unfulfilled basic needs; provided unstable financial and housing

situations; and was repeatedly incarcerated. *Doe (2016-32)*, 161 Idaho at 760–61, 761 n.4, 390 P.3d at 1287–88, 1288 n.4.

In this case, even accounting for Child's condition and the circumstances stemming from his underlying juvenile corrections proceeding, the record fails to show anything close to the parent profiles presented in the cases discussed above. The Department Report includes assessments of Jane Doe and John Doe with respect to their functioning, parenting ability, disciplinary practices, and protective capacities. Neither Doe was reported to have concerns or history with domestic violence, legal issues, past parental abuse, mental health, or substance abuse. Jane Doe completed schooling to be a social worker, and she plans to use her education for future employment. John Doe is a college professor. Jane Doe reported that she and her husband have a good support system with their family and friends. She explained that she has concerns for Child's mental health, and that she is open to him receiving mental health services to ensure his well-being. John Doe expressed love for all of his children. The Report notes that the Does maintained contact with the Department since Child was placed in shelter care to ensure his basic needs were met. As noted above, at the time the assessments were drafted, Jane and John Doe reported that they wanted to be a part of Child's life, and that they did not want to terminate their parental rights given their love and care for him. The Does both reported to using disciplinary practices such as removing television and play time privileges. Jane Doe specifically is described as being cooperative with the Department and responsive to suggestions. She is also referred to as the party who notified the Department of the sexual assault incident, although the Report explains that both of the Does have been integral in the execution of the safety plan.

Elsewhere in the Report, John and Jane Doe are described as cooperative and—at some point following the incident—wanting to still care for Child and to not dissolve their adoption. The Report adds that the Does have employed certain services as a means of assisting their family through the ordeal. After Child was placed with the Utah facility, the Does remained in communication with him, including visitations when appropriate.

On the other hand, evidence showing an inability to discharge parental responsibilities is minimal and largely unconvincing as to that conclusion. During their testimony, both John and Jane Doe acknowledged that they were receiving treatment for depression in light of the situation; however, the Does asserted that they were current on their medication and counseling. While the Petition states that termination is warranted because the Does are unable to discharge

13

parental responsibilities, no facts or additional information accompanies this claim. Further, the Department's recommendation for termination—as set forth in the Report—does not reference a lack of ability of the Does to discharge parental responsibilities.

Without compelling substantive evidence, the primary argument for the Does' unfitness appears to be premised on the same idea that undergirded the Department's argument as to Child's best interest: namely, Child cannot return to the Does' home due to the nature of the sexual assault incident and the presence of the victim and other children in the home. This position is found within the record in the (1) Order Expanding to Child Protective Act Proceeding, (2) Department Report (3) Findings of Fact and Conclusions of Law, (4) testimony of John Doe, (5) testimony of Jane Doe, and (6) testimony of the Department social worker.

John Doe characterized this position succinctly, stating that termination was necessary in order for him to be able to provide a safe environment and protect his other children. He testified that he did not feel that Child could ever be in his home again or ever be supported by him or his family. Similarly, Jane Doe testified that she did not have a place for Child in her home because he sexually assaulted one of her children and inflicted abuse on all three of her other children. At the termination hearing, the Department social worker testified likewise, stating, "[Child] is not allowed to be around younger children, and his victims would also be in the home. And so there's no way he could ever return to their home." The Department asserts on appeal that this collection of testimony underlies the magistrate court's finding: "The court heard testimony that the Does cannot bring [Child] back into the home and the [c]ourt made the finding of inability based on that testimony."

Taken as a whole, however, the record does not provide substantial and competent evidence to support a finding that the Does were unable to discharge parental responsibilities. The record establishes that the Does are able, caring, and attentive parents who have provided an environment for their children that is both financially and physically stable and secure. The evidence shows the Does to be emotionally and mentally well-adjusted in spite of the difficult circumstances. Quite simply, it is hard to conceive of more ideal candidates for being able to discharge parental responsibilities.

The above-stated position that the Department argues is factually sufficient for the magistrate court's finding, at best, evokes the idea that housing uncertainty exists; however, this claim is left unsupported by the record in multiple ways. First, aside from the aforementioned

testimony, there is no evidence showing that Child is prohibited from returning to the Does' home. Evidence that may substantiate this claim could take the form of a court order, a decree from Child's juvenile corrections proceeding, or an expert report, opinion, or testimony. Yet, nothing of this kind is found or even referred to in the record. Second, even presuming that Child cannot return to the home, the record is barren of evidence suggesting that that fact alone causes the Does to be unable to discharge parental responsibilities. As it stands, the only evidence suggesting that the Does cannot provide an alternative placement option is conclusory statements from the Department and Jane Doe that such an option is not available. The magistrate court's written decision does not address either of these deficiencies. Without evidence substantiating this position, the record lends credence to Child's contention that the Does are able but unwilling to discharge parental responsibilities. In effect, the Does' intended refusal to continue to discharge parental responsibilities more closely resembles custody relinquishment through neglect or abandonment.

In their briefs on appeal, the parties do not cite to authority showing section 16-2005(1)(d) has been applied in a situation consistent with Child's reframing of the Does' position. This is perhaps understandable, as a factually analogous case does not appear to exist under Idaho case law. Moreover, the case here is not equivalent to a situation where the parent, perhaps recognizing the likely outcome of a termination proceeding, forgoes the opportunity to continue a defense against what would otherwise be an involuntary termination. Therefore, with respect to the record and the facts at hand, the Court is left with the complex issue of whether a finding of inability to discharge parental responsibilities can be satisfied by the unwillingness of the parent.

Other jurisdictions have addressed whether parental rights can be terminated in situations where a parent claims an inability to care for his or her child due to the child's special needs or behavioral problems; however, reliance on these cases is limited due to such decisions being founded on the specific nature of the respective jurisdictions' statutory schemes. *See, e.g.*, *In re J.F.*, 862 A.2d 1258, 1260 (Pa. Super. Ct. 2004) (requiring agency consent to voluntarily relinquish parental rights); *In re Welfare of J.D.N.*, 504 N.W.2d 54, 57 (Minn. Ct. App. 1993) (requiring written consent and a showing of "good cause" for voluntary termination); *see also* *P.S. v. Jefferson Cnty. Dep't of Hum. Res.*, 143 So. 3d 792, 796–97 (Ala. Civ. App. 2013) (allowing involuntary termination where "the parents of a child are unable or *unwilling* to

15

discharge their responsibilities" (emphasis added) (quoting Ala. Code § 12-15-319(a)(12)); *In re Adoption of M.S.*, 103 Cal. Rptr. 3d 715, 719–21 (Ct. App. 2010) (interpreting statute that allows parent to set aside adoption of child with developmental disability or mental illness as a result of conditions existing before the adoption).

Regardless, it is not necessary to look to other jurisdictions due to the potential outcomes for section 16-2005(1)(d). As it stands, if the Court were to affirm the magistrate court's finding, it would essentially convert section 16-2005(1)(d) into an additional form of voluntary termination of parental rights, equivalent to the voluntary consent method under section 16-2005(4). Section 16-2005(4) provides grounds for termination of parental rights through voluntary consent so long as the consent is filed "in conjunction with a petition for adoption initiated by the person or persons proposing to adopt the child, or where the consent to termination has been filed by a licensed adoption agency." Thus, establishing this second form of voluntary termination would undermine an inherent purpose of section 16-2005(4)—namely, section 16-2005(1)(d) would be available as an escape from the concurrent adoption requirement under the former provision. Absent this safeguard, the new voluntary termination method would invite the termination of parental rights to avoid costs, care, or other obligations of parenthood while at the same time leaving those burdens with the State. Jane Doe's testimony alluded to this very quandary, as she noted that the Department's decision to pursue child support accelerated their decision-making process to terminate parental rights.

The Child Protective Act and regulations governing the Department of Health and Welfare reveal additional consequences for using section 16-2005(1)(d) as a form of voluntary termination. Specifically, pursuant to authority under the Act, the Child Protection Central Registry was established to assist the Department in protecting children from individuals who have previously abused, neglected or abandoned children. I.C. § 16-1629(3); I.D.A.P.A. 16.06.01.561. The Central Registry is designed to enable the dissemination of information, including particular risk levels that are assigned to each incident where abuse, neglect, or abandonment has been substantiated. I.D.A.P.A. 16.06.01.561, .563. Relevant here is the designation for individuals who have failed to discharge parental responsibilities as described under Idaho Code section 16-1602(31). I.D.A.P.A. 16.06.01.563.03(c). Section 16-1602(31)(b) closely tracks the language of section 16-2005(1)(d). *See Idaho Dep't of Health & Welfare v. Doe (2016-32)*, 161 Idaho 754, 760–61 n.4, 390 P.3d 1281, 1287–88 n.4 (2017) (applying both

16

statutes). In such instances, an individual is designated in the Central Registry as posing a mild to medium risk of harm to the health, safety, or well-being of a child. I.D.A.P.A. 16.06.01.563.03. The Department maintains this designation for a minimum of five years before the individual has an opportunity to petition the Department for removal. *Id.*

In sum, we stress that the provisions under 16-2005, including subsection (1)(d), must apply equally toward biological and adoptive children. I.C. § 16-1508 (stating adopted children "shall have all the rights and shall be subject to all the duties" of the legal parent-child relationship). Obviously the Does' current situation presents difficulties—however, the record does not demonstrate that those difficulties are beyond the responsibilities and legal obligations that come with rearing a biological child. As stated above, the absence of evidence showing termination is in Child's best interest is dispositive as to section 16-2005(1)(d). Notwithstanding, given the absence of substantial and competent evidence in the record, and in light of the problem with expanding section 16-2005(1)(d) to allow unwillingness to define inability, the magistrate court also erred in finding that John and Jane Doe are unable to discharge parental responsibilities.

**C. Voluntary consent under Section 16-2005(4) is not a legal basis for termination where there is no concurrent petition for adoption.**

Finally, the magistrate court found that termination was warranted under section 16-2005(4). As explained above, this provision permits termination where voluntary consent is filed with a petition for adoption or where a licensed adoption agency files its consent to termination. I.C. § 16-2005(4); *In re Termination of Parental Rights of Doe (2013-17)*, 155 Idaho 896, 900, 318 P.3d 886, 890 (2014). Due to this conditional language, the provision applies in the specific context where parents are consenting to a concurrent adoption. *See In re Adoption of Doe*, 156 Idaho 345, 352, 326 P.3d 347, 354 (2014) (Horton, J., specially concurring). Here, the magistrate court's written decision indicates that the Does each provided voluntary consent to termination pursuant to section 16-2005(4). In its oral ruling, the magistrate court explained that the Does' voluntary consent was one of the grounds for termination of the parental rights.

Child argues that the magistrate court erred in terminating the Does' parental rights because the Does' consent was not joined by the satisfaction of the adoption requirement. The record shows this to be the case—neither a petition for adoption, nor consent from a licensed adoption agency was filed prior to termination. Therefore, the requirements of section 16-2005(4) were not met, and it was not proper grounds for termination.

17

As such, none of the three statutory bases for termination found by the magistrate court were proper, and the judgments are reversed.

## D. The magistrate court was not required to ensure the Department made reasonable efforts to reunify Child with the Does.

Child's final argument on appeal is that the magistrate court failed to ensure that the Department made reasonable efforts to reunify Child with the Does, and that this failure also violated his due process rights. Child contends that the Department has a duty to reunify families when possible, and that termination should only be sought when reasonable efforts to reunite the child to the home have failed or are otherwise unnecessary due to aggravated circumstances. In support of this argument, Child cites to sections 16-2001(1)(b), 16-2001(2), and 16-1602(6).

To the extent Child's argument turns on whether reasonable reunification efforts were made pursuant to the magistrate court's orders of termination, he is without statutory support. We have explained that inquiry into reunification efforts is not relevant for the court to terminate parental rights. *Idaho Dep't of Health & Welfare v. Doe (2016-11)*, 160 Idaho 824, 834, 379 P.3d 1094, 1104 (2016). None of the statutory provisions cited by Child set forth a requirement that such a finding be made prior to termination. Sections 16-2001(1)(b) and (2) merely provide one of the purposes and an underlying philosophy of Chapter 20, while section 16-1602(6) is the definition of "aggravated circumstances" under the Child Protective Act. I.C. §§ 16-1602(6), 16-2001(1)(b), (2). Reasonable reunification efforts are a requirement under the Child Protective Act, which imposes a duty to ensure such efforts are made throughout the child protective action. *Doe*, 160 Idaho at 834, 379 P.3d at 1104. Child raised this issue in the alternative to his other arguments, and therefore its failure does not affect our holding that termination of the Does' parental rights was in error.

## IV.    CONCLUSION

For the foregoing reasons, we reverse the judgments of the magistrate court terminating the parental rights of John and Jane Doe. With the judgments having been reversed, the magistrate court's order of guardianship in the Department is likewise reversed.


Chief Justice BURDICK, and Justices JONES, HORTON and BEVAN CONCUR.

18